**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

CONSTANCE BENNETT,                    :
                                       :
    Plaintiff,                        :
                                       :    Case No. C2-08-CV-0663
        v.                            :
                                       :    JUDGE ALGENON L. MARBLEY
BOARD OF EDUCATION OF                 :
   WASHINGTON COUNTY JOINT            :    Magistrate Judge King
   VOCATIONAL SCHOOL DISTRICT,        :
                                       :
    Defendant.                        :

## OPINION AND ORDER

## I. INTRODUCTION

This matter is before the Court on the Motion of Defendant Board of Education of

Washington County Joint Vocational School District ("Board") for Summary Judgment on

Plaintiff's Amended Complaint (Doc. 62). Plaintiff Constance Bennett alleges that she suffered

wrongful discharge in violation of 42 U.S.C. § 12112(b)(4) of the Americans with Disabilities

Act ("ADA") (Count I); retaliatory non-renewal in violation of 42 U.S.C. § 12203(a) of the ADA

(Count II); and breach of contract (Count III) (Doc. 42). The Board now moves for summary

judgment on Count II only. For the reasons set forth below, the Motion is **DENIED.**

## II. BACKGROUND

### A. Factual Background

#### *1. Johnson's Enrollment*

The Board governs the Washington County Joint Vocational School District

("WCJVSC"), which is in turn the governing body of the Washington County Career Center

("WCCC"). Beginning in January 2008, the WCCC offered a one-year Surgical Technologist Program that required only a high school diploma or general education degree for admission.

From 1999 to 2007, Bennett worked for the Board as an instructor on a periodic and part-time basis. In 2007, Bennett again contracted with the Board to be an instructor – specifically, the Instructor of the Safety Supervisor course – and also contracted to serve as the Board's Medical Programs Director/Supervisor–Adult Technical Training from July 1, 2007 through June 30, 2008. In this administrative role, Bennett was responsible for developing curricula, ensuring compliance with regulatory requirements for the medical programs, making recommendations on staff hiring, and coordinating facilities for the program's satellite campuses. Only her performance as the Medical Programs Director is at issue in this case.

On February 26, 2008, Bennett met with Carrie Johnson and helped Johnson enroll in the Board's Surgical Technologist program, which had begun in January. During that conversation, Johnson and Bennett discussed the fact that Johnson had a disability involving reading and comprehension and the types of accommodations she would need.[1]

On February 27, 2008, Bennett emailed the Board's Director of Adult Education, Dewayne Poling, to advise him of Johnson's request for admission. Although admission decisions were not ordinarily part of his job duties, Poling was responsible for granting admission requests for students who, like Johnson, sought to be admitted several weeks after classes had already begun. Poling granted Johnson's admission based upon Bennett's representation that Johnson had already learned the material covered in the first seven weeks of classes when she earned her Associate's Degree in General Science at Washington State Community College. According to Poling, Johnson's admission was conditional: Johnson would

---
[1] The Defendant does not contest Johnson's status as a disabled person under the ADA.

have to submit a transcript from Washington State Community College to prove that she had already learned the material covered in the first seven weeks. Bennett disputes this allegation, contending that Johnson's admission was conditioned only on her completion of the application process and payment of tuition.

That same day, Bennett registered for classes and discussed with WCCC administrators her need for an accommodation of her disability. In a conversation with Michele Grosklos, Debbie Cline, and Barbara Wolfe, Johnson asked that the school make her books available in audio format or that they provide her with a Kurzweil Reader device.

A night supervisor named Liz Pickrell delivered a note to Johnson in the evening of February 27, 2008 stating that Johnson needed to provide proof of her degree and of her disability. On February 28, Johnson faxed WCCC a copy of her Associate's Degree and a letter from her Bureau of Vocational Rehabilitation case worker demonstrating her disability. Johnson alleges that Poling never informed either her or Bennett that the copy of the diploma was insufficient and did not ask for further documentation of her Associate's Degree.

### 2. Johnson's Dismissal and Reinstatement

In a letter dated March 4, 2008, Poling dismissed Johnson from the program. A staff member delivered the letter to Johnson on March 4 when she arrived on campus for class. The letter read, in part, as follows: "With regrets, I need to inform you that we are not able to apply your prior educational training to our Surgical Technologist Program. We will offer another Surgical Technologist Program January 2009." Poling  offered Johnson a full refund of the tuition she had already paid.

The Parties dispute the degree to which Johnson's request for accommodation affected

Poling's decision to dismiss her. Poling alleges that he did not learn of Johnson's disability or her request for an accommodation in 2008. Bennett, however, alleges that on March 3, 2008, Poling and Bennett discussed Johnson's request. During that conversation, Poling informed Bennett that the administrative staff was struggling to find Johnson's course books in audio format and questioned the basis for Johnson's disability. He indicated that Johnson's request would cause the WCCC to spend more time on one student than was warranted. After Bennett reminded Poling of the school's legal obligation to accommodate its students, Poling said that he would find out what Johnson needed and then make a decision.

Johnson emailed Bennett for clarification of Poling's letter on March 5, 2008. Bennett advised Johnson to continue attending classes until she could talk with Poling. Johnson followed Bennett's advice, and Bennett approached Poling to discuss Johnson's dismissal. According to Bennett, Poling said that Johnson was dismissed because her requested accommodations were too difficult to meet. Bennett alleges that she again reminded Poling that the law obligated the WCCC to accommodate Johnson's request.

Johnson appealed her dismissal with the Board at its meeting on March 11, 2008. Johnson drafted a letter, dated March 11, 2008, in which she recited her belief that Poling dismissed her because of her disability in violation of the ADA and other regulations. Bennett was also at the meeting and read Johnson's letter aloud to the Board in an attempt to persuade them to reconsider their decision. Bennett and Johnson's efforts were successful: the Board agreed to allow Johnson to continue in her program and to make up the class time she missed at the beginning of the semester in the following year's program.

*3. Johnson's Illness and Bennett's Advocacy*

On March 16, 2008, Johnson fell ill and was hospitalized for one week. Once out of the hospital, Johnson would not be able to walk for long periods of time, sit for long periods of time, or climb steps. Because Johnson's classes were on the second floor and not accessible other than via stairs, Johnson's physical limitations would force her to miss a substantial amount of class. Johnson telephoned Bennett to inform her of the illness and to ask what her options were with respect to the missed classes. In a letter dated March 19, 2008, Bennett advised Johnson to study from home and offered to contact Johnson's instructors for the missed assignments to help Johnson avoid falling behind. She noted that the program required participation in eighty surgical cases and explained that she and other administrators were working on developing an alternate option for Johnson to meet this requirement. Finally, she noted that the program had yet to obtain Johnson's requested accommodation for her educational disability but that she would try to follow up on that issue.

Bennett alleges that she spoke with Poling on March 24, 2008 about making the program accessible to students who, like Johnson, could not access classrooms above the first floor. She explained that Johnson would need an alternate plan for completing her course work since she was unable to access her classroom and reminded Poling about the school's obligations under the ADA. Poling responded that Johnson could not return to class.

Bennett alleges that she then tried to reach Roger Bartunek, the Superintendent of the WCCC, to discuss Johnson's situation, and, after several failed attempts, was successful. She argued to Bartunek that the law mandated that the medical programs classroom be accessible to Johnson and other students who could not navigate stairs for medical reasons. Bartunek rejected

Bennett's request.

*4. Non-Renewal of Bennett's Contract*

On March 4, 2008, the same date on which Poling initially dismissed Johnson from the program, Poling told Bennett that he was recommending to the Board that her contract not be renewed after it expired. He stated that his recommendation was based solely on financial considerations about the future of the program of which she was the Director.

Bennett alleges that she attempted unsuccessfully to reach Bartunek to ask him to reconsider Poling's decision. As a general matter, Bartunek would make recommendations regarding personnel decisions to the Board after receiving an initial recommendation from Poling. Bartunek alleges that he and Bennett did meet to discuss the non-renewal. According to Bartunek, he told Bennett that the decision was based on financial considerations and that he would not change his opinion. He asserts that neither the topics of Johnson's request for accommodations for her disability nor Bennett's involvement with that request were raised at that time.

At the Board meeting on March 11, 2008, Bennett spoke in her own defense as well as in defense of Johnson. She disputed the financial figures on which her non-renewal was allegedly based and contended that Poling recommended non-renewal as retribution and out of gender and age discrimination. Bartunek was also present and recommended eliminating Bennett's position. The Board agreed with Bartunek, voting not to renew Bennett's contract as Medical Programs Director/Supervisor–Adult Technical Training. Bennett was notified of the non-renewal of her contract in a letter dated March 14, 2008 from the Treasurer of the Board; she received the letter on March 24, 2008.

Bennett spoke with Poling on March 24, 2008 about her duties between then and the expiration of her contract on June 30, 2008. Poling told her she could work in a limited role or she could simply stay home while receiving paychecks. Later that same day, Poling told Bennett to fill out a request for four personal days because he did not want her to come to the office for the rest of the week. Bennett did so, but, she alleges, only under duress. On April 4, 2008, Poling left Bennett a voicemail on her personal phone telling her not to come to work the following Monday. In a letter dated April 7, 2008, Poling told Bennett to contact Bartunek or Poling concerning her employment at the WCCC. At that point, the Board stopped direct depositing Bennett's paychecks into her account.

*5. Johnson's Dismissal*

Following Bennett's advice, Johnson did not return to classes the week of March 24, 2008 or the week of April 4, 2008. She continued to attempt to complete work from home, and, in that regard, tried to contact Bennett about turning in the work that she had completed. Because Bennett was no longer at the WCCC, she did not receive the messages Johnson left her on her work voicemail. Not having heard from Bennett, Johnson then tried to contact her instructors by calling the WCCC administrative offices. Poling's staff, however, did not relay the messages to the instructors.

By letter dated April 7, 2008, Poling told Johnson that he and not Bennett was in charge of the medical program for the remainder of the school year. He also asked Johnson to schedule a meeting with him to discuss her attendance in the program. Johnson replied to the letter by email on April 11, 2008, which she resent on April 15, 2008 after Poling failed to respond. On April 17, 2008, Poling emailed Johnson back and told Johnson that she should register for the January

2009 program because her absences prevented her from receiving credit for the 2008 program.

*6. Reassignment of Bennett's Duties*

After the Board fired the Plaintiff, at least some of her responsibilities were reassigned to Lenora Binegar for the remainder of the spring term. Since Bennett's termination, the Board has not officially hired a replacement for her position. Instead, according to Bartunek, Bennett's termination caused some of her duties to fall back on those one level beneath her in the organization's hierarchy while it rendered obsolete others that were unique to her position.

At issue is whether Binegar became the de-facto replacement for Bennett. The evidence shows that before Bennett's termination, Binegar served as an instructor for the medical assistant program and, at Bennett's request, created lesson plans and completed reports for the WCCC's accrediting body. After Bennett left, Binegar accepted an additional contract for the position of "Medical Coordinator." In that position, which she performed from May 2008 through June 2010, Binegar checked clinical sites, picked out textbooks, and continued reporting to the accrediting body. Although the contract did not specify over which programs Binegar had authority, Binegar testified at her deposition that all of her responsibilities were solely related to the medical assistant program. From May 2010 to June 2010, Binegar began developing medical assistant programs off-site in her new position as "Program Developer," which she held concurrently with her positions as instructor and Medical Coordinator. As of June 2010, Binegar's three sets of responsibilities were combined into the position of "Medical Programs Coordinator"; according to Binegar's deposition testimony, all of her duties remained focused solely on the medical assistant programs.

Binegar's job titles differ depending upon the source. In her contracts, as described

above, Binegar held the titles of Instructor, Medical Coordinator, Program Developer, and Medical Programs Coordinator. On its website, the WCCC listed Binegar as a "Medical Director" and, on the same web page, a "Medical Assistant" in 2008; a "Medical Programs Coordinator" in 2009; and a "Medical Programs Coordinator" in 2011. The 2010-2011 WCCC Student Handbook named Binegar as the "Medical Programs Advisor." Finally, in Binegar's time sheets, which she did not always fill out personally, Binegar held the title of "Medical Advisor."

## B. Procedural History

Bennett filed her initial Complaint on July 9, 2008 alleging wrongful discharge in violation of 42 U.S.C. § 12112(b)(4) of the ADA (Count I); wrongful non-renewal of an employment contract in violation of Ohio public policy (Count II); and breach of contract (Count III) (Doc. 2). On December 19, 2008, the Board moved to dismiss Count II of Bennett's Complaint for failure to state a claim upon which relief could be granted (Doc. 7). Fed.R.Civ.P. 12(b)(6). On September 10, 2009, this Court issued an Order granting the Board's motion. *Bennett v. Bd. of Educ. of Wash. Cnty. Joint Vocational Sch. Dist.*, Case No. 2:08-CV-663, 2009 U.S. Dist. LEXIS 82760 (S.D. Ohio Sept. 10, 2009). Bennett responded by filing her First Amended Complaint on April 13, 2010, in which she reasserted Counts I and III of her initial Complaint and substituted a claim for retaliatory non-renewal under 42 U.S.C. § 12203 of the ADA for her dismissed Ohio public policy claim (Doc. 42).

Bennett later stipulated to the dismissal of Count I of her First Amended Complaint – wrongful discharge under 42 U.S.C. § 12112(b)(4) – leaving only her claims for retaliatory non-renewal and breach of contract pending (Doc. 43). The Board moved to dismiss Bennett's

-9-

remaining claims by way of an April 27, 2010 motion (Doc. 48), and the Court denied that

motion on October 4, 2010, *Bennett v. Bd. of Educ. of Wash. Cty. Joint Vocational Sch. Dist.*,

Case No. 08-CV-663, 2010 U.S. Dist. LEXIS 106033 (S.D. Ohio Oct. 4, 2010).

Defendant moved for summary judgment on Count II on September 30, 2010 (Doc. 62).[3]

The Court heard oral argument from the Parties and ordered supplemental briefing that has been

completed (Docs. 75 & 78). The matter is now ripe for decision.

### III. STANDARD OF REVIEW

Summary judgment is proper if "there is no genuine issue as to any material fact [such

that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). But "summary

judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for

the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In

considering a motion for summary judgment, a court must construe the evidence in the light most

favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 587 (1986). The movant therefore has the burden of establishing that there is no genuine

issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v.

Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993). The central inquiry is

"whether the evidence presents a sufficient disagreement to require submission to a jury or

whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at

251-52. But the non-moving party "may not rest merely on allegations or denials in its own

---

[3]Defendant filed its motion for summary judgment before the Court ruled on its motion to dismiss. Defendant, however, incorporated its motion to dismiss, in which it argued that Count III should be dismissed on jurisdictional grounds if the Court dismissed the Plaintiff's federal claims. Because the Court concludes that the Plaintiff's federal claims should not be dismissed on summary judgment, the Defendant's argument that the Court lacks supplemental jurisdiction over the state law claim is moot.

pleading." Fed. R. Civ. P. 56(e)(2); *see also Celotex*, 477 U.S. at 324; *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994). The non-moving party must present "significant probative evidence" to show that there is more than "some metaphysical doubt as to the material facts." *Moore v. Philip Morris Co.*, 8 F.3d 335, 339-40 (6th Cir. 1993). When ruling on a motion for summary judgment, a district court is not required to sift through the entire record to drum up facts that might support the nonmoving party's claim. *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). Instead, the Court may rely on the evidence called to its attention by the parties. *Id*.

## IV. LAW AND ANALYSIS

In Count II of the Plaintiff's First Amended Complaint, the Plaintiff alleges that in retaliation for opposing discrimination against a disabled student, the Defendant did not renew her employment contract in violation of Title V of the ADA. *See* 42 U.S.C. § 12203(a).

Title V of the ADA contains the ADA's anti-retaliation provision, which provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such an individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a); *see also Albra v. Advan, Inc.*, 490 F.3d 826, 829 (11th Cir. 2007).

To establish a prima facie case of retaliation, a plaintiff must show the following: (1) that she engaged in protected activity; (2) that she suffered an adverse employment action; and (3) that a causal connection existed between the protected activity and the adverse action. *Penny v. United Parcel Serv.*, 128 F.3d 408, 417 (6th Cir. 1997). The Plaintiff "need not establish that the

conduct she opposed actually constituted an ADA violation." *Freilich v. Upper Chesapeake Health*, 313 F.3d 205, 216 (4th Cir. 2002); *see also Barrett v. Lucent Techs.*, 36 F. App'x 835, 840 (6th Cir. 2002) (citing *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579-80 (6th Cir. 2000)). If a plaintiff carries her burden of establishing a prima facie case, a burden that "is not intended to be an onerous one," the defendant then bears the burden to present a legitimate, non-discriminatory reason for the adverse action. *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001). If the defendant presents such a reason, the plaintiff bears the ultimate burden of proving that the proffered reason for the action was merely a pretext for discrimination. *Id.*[4]

The Defendant concedes that its decision not to renew the Plaintiff's employment contract constitutes an adverse employment action but argues that the Plaintiff did not engage in a protected activity and that, in the alternative, she cannot show a causal connection between the protected activity and the adverse action. The Defendant further argues that it has demonstrated a legitimate, non-discriminatory reason for the adverse action that the Plaintiff has not rebutted. The Plaintiff challenges each of the Defendant's arguments, and the Court will consider them in turn.

### A. Whether Plaintiff Engaged in a Protected Activity

Plaintiff claims that she engaged in a protected activity by opposing discrimination against Carrie Johnson. Defendant argues that Plaintiff did not engage in a protected activity because of the following reasons: (1) she did not oppose discrimination but merely passed along

---

[4]This Court does not distinguish between cases based on retaliation claims under the ADA, the Age Discrimination in Employment Act, and Title VII because courts analyze retaliation claims under these statutes in the same manner. *See Penny*, 128 F.3d at 417; *Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 591 (6th Cir. 2007).

information about Johnson's requested accommodations; and (2) activities within the scope of

employment cannot constitute a protected activity. Both of these arguments are without merit.

First, a plaintiff has engaged in a legally protected activity if her opposition to a practice

"was reasonable and based on a good-faith belief that the employer was acting in violation of"

the ADA. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 516 (6th Cir. 2009). If a plaintiff complains

to anyone who works for her employer about allegedly unlawful practices, that constitutes

protected opposition activity. *Johnson v. University of Cincinnati*, 215 F.3d 561, 579 (6th Cir.

2000); *Butts v. McCullough*, 237 F. App'x 1, 5 (6th Cir. 2007) (citing *Johnson*). The plaintiff's

complaint, however, must "specifically address discrimination." *Weaver v. Ohio State Univ.*, 71

F. Supp. 2d 789, 793 (S.D. Ohio 1998) ("Complaints concerning unfair treatment in general . . .

are insufficient to constitute protected activity."); *see also Booker v. Brown & Williamson*

*Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989) ("[A] vague charge of discrimination in an

internal letter or memorandum is insufficient to constitute opposition to an unlawful employment

practice.").

The Defendant argues that the Plaintiff's facilitation of Johnson's request for an

accommodation is not an oppositional activity. The Plaintiff, however, has presented evidence,

which the Court must construe in her favor, that she specifically cited the WCCC's legal

obligations to Poling in conversations on March 3, March 5, and March 24 when discussing

Johnson's request for an accommodation. In each of these conversations, the Plaintiff said that a

student needed an accommodation for her disability, Poling resisted, and the Plaintiff stated that

the law required the WCCC to provide the accommodation. Indeed, the Plaintiff alleges that on

at least some of these occasions, she mentioned the ADA by name. By claiming that a failure to

accommodate Johnson would constitute illegal activity, these actions are squarely within the category of behavior that constitutes oppositional activity. *See Crawford v. Metro. Gov't of Nashville & Davidson County*, 129 S. Ct. 846, 850-51 (2009) (holding that "an ostensibly disapproving account of sexually obnoxious behavior toward [the plaintiff] by a fellow employee" constituted oppositional activity); *Christian v. Wal-Mart Stores, Inc.*, No. 07-14482, 2009 U.S. Dist. LEXIS 9787, at *16 (E.D. Mich. Feb. 10, 2009) (concluding that plaintiff engaged in oppositional activity when plaintiff told employer that co-worker's termination was "wrong, that it was due to his age, and that [the employer] 'totally discriminated against him'").

Second, the Defendant argues that an employee has not engaged in a protected activity where that employee's actions were part of her normal job duties; because the Plaintiff's actions on behalf of Johnson fell within her job duties, she did not engage in a protected activity. This argument can be quickly dispatched. The only case cited by the Defendant in support of its position is one that carries no precedential weight in its jurisdiction or that of this Court. *Isler v. Keystone School District,* 335 F. App'x 200, 201 (3d Cir. 2009) ("[O]ur opinion is wholly without precedential value."). More fundamentally, the Sixth Circuit has already ruled that the fact that a plaintiff is tasked with monitoring an employer's compliance with anti-discrimination laws "is of no consequence to his [or her] claim" for retaliation. *Johnson v. University of Cincinnati*, 215 F.3d 561, 579 (6th Cir. 2000). Hence, even if the Defendant could show that the Plaintiff's job duties required her to advocate for students with disabilities, the viability of the Plaintiff's retaliation claim would be unaffected.

The Defendant therefore has failed to show as a matter of law that the Plaintiff's actions did not fall under the protections of the ADA's anti-retaliation provision. Having determined that

-14-

the Plaintiff has met her prima facie burden to show that she engaged in a protected activity, the

Court must now consider whether the Plaintiff has sufficiently demonstrated that the Defendant

did not renew her contract because of her oppositional activities.

### B. Whether Plaintiff Has Met the Causation Prong of Her Prima Facie Case

The Plaintiff's theory of causation rests primarily upon the temporal proximity of the

Plaintiff's advocacy for Johnson and the decision not to renew her contract. Poling first told the

Plaintiff that he was recommending that her contract not be renewed on March 4, 2008, the day

after the Plaintiff told him of her position that failing to accommodate Johnson's disability would

be a violation of the law. Then, on March 24, after the Board sent the Plaintiff the letter of non-

renewal, the Plaintiff and Poling again had an argument about accommodating Johnson. Later

that day, Poling told the Plaintiff not to return to work to complete the remainder of her current

contract.

To demonstrate causation, the Plaintiff "must present evidence sufficient to raise the

inference that her protected activity was the likely reason for the adverse action." *Cohen v. Fred

Meyer, Inc*., 686 F.2d 793, 796 (6th Cir. 1982); *see also Brown v. Chase Brass & Copper Co*., 14

F. App'x 482, 489 (6th Cir. 2001) (quoting *Cohen*). Temporal proximity alone may, in some

circumstances, be sufficient to prove a plaintiff's prima facie case: "Where an adverse

employment action occurs very close in time after an employer learns of a protected activity,

such temporal proximity between the events is significant enough to constitute evidence of a

causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v.

Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) (collecting cases). In other words, in

the totality of the circumstances, "extremely close temporal proximity could permit an inference

of retaliatory motive, but . . . often evidence in addition to temporal proximity is required to permit the inference." *Vereecke v. Huron Valley Sch. Dist.,* 609 F.3d 392, 400 (6th Cir. 2010) (construing *Mickey*).

In the case *sub judice*, the Plaintiff has presented evidence that only a single day passed between the conversation in which she questioned the legality of Poling's conduct towards Johnson and Poling's decision to recommend that the Plaintiff's contract not be renewed. Time spans between protected activity and retaliatory action significantly longer than the single day alleged by the Plaintiff have been held to be sufficient standing alone to support a plaintiff's prima facie case of retaliation. *See, e.g., DiCarlo v. Potter*, 358 F.3d 408, 422 (6th Cir. 2004) (reversing grant of summary judgment because twenty-one days between filing of EEO complaint and termination was sufficient to raise the inference of retaliation); *Russell v. Nat'l Amusements, Inc*., No. 3:07 CV 3216, 2009 U.S. Dist. LEXIS 11598, at *35 (N.D. Ohio Feb. 4, 2009) (denying summary judgment because two days between distribution of ADA materials and termination was sufficient for prima facie case). Thus, the Court concludes that the evidence is that the adverse action occurred "very close in time" after the Plaintiff's protected activity, *Mickey*, 516 F.3d at 525, raising the "inference that her protected activity was the likely reason for the adverse action," *Cohen*, 686 F.2d at 796.

Although in this case the evidence of temporal proximity alone is sufficient to raise the inference of retaliation, the Plaintiff has offered additional evidence of retaliatory motive. The linkages between Poling's treatment of Johnson and his treatment of the Plaintiff suggest that he viewed them as a package deal. He notified Johnson of her dismissal (later reversed) on March 4, 2008, the same day on which he told the Plaintiff he was advocating for her termination.

Likewise, he sent both women letters on April 7, 2008, demanding of Johnson that she contact him concerning her enrollment and demanding of the Plaintiff that she contact him concerning her employment. The Plaintiff has, in addition, presented evidence that Poling resented Johnson's request for an accommodation and the Plaintiff's attempts to advocate on her behalf. All of this evidence combined with the temporal proximity leads this Court to conclude that the Plaintiff has satisfied her prima facie burden of demonstrating causation between the protected activity and the adverse employment action. The burden therefore shifts to the Defendant to show that it had a non-discriminatory reason for the adverse employment action.

### C. Whether Defendant Has Shown a Non-Discriminatory Reason for its Non-Renewal of Plaintiff's Contract

The Defendant asserts that it had a non-discriminatory reason for declining to renew the Plaintiff's contract. According to the Defendant, the Plaintiff was hired when the WCCC hoped to expand its medical program by, among other things, offering courses at satellite locations. The 2007-2008 school year was the first year of the new program and Bennett's position as head of that program; according to Bartunek, the year was not a success. In short, Bartunek (who, along with Poling, recommended eliminating the Plaintiff's position for the following year) determined that the expanded program lacked the financial strength to continue based on lower-than-expected enrollment. Bartunerk's analysis is supported by the testimony of Board member Neil Huck, who independently reviewed the WCCC's financials after the March 11, 2008 Board meeting and agreed that they supported the Board's decision not to renew the Plaintiff's contract. His testimony is further corroborated by a financial summary for fiscal years 2006-2008. The summary reveals, as explained by Bartunek in an affidavit, that although the Adult Technical

Training programs experienced dramatic increases in both tuition and expenditures, the increase in expenditures far outpaced that of the tuition. By the Court's calculation, in 2008 the Adult Technical Training program ran a deficit of $164,932.30, a number equal to 58% of the program's total revenue for that year. The Court concludes that this evidence is sufficient to meet the Defendant's burden of showing a legitimate non-discriminatory reason for the adverse employment action.

**D. Whether Plaintiff Has Rebutted Defendant's Non-discriminatory Reason for its Non-Renewal of Plaintiff's Contract**

Having demonstrated a non-discriminatory reason for terminating the Plaintiff, the Defendant is entitled to summary judgment unless the Plaintiff can show "not only that the defendant's proffered reason was a pretext, but that the real reason for the employer's action was intentional retaliation." *Imwalle v. Reliance Med. Prods*., 515 F.3d 531, 544 (6th Cir. 2008). The Plaintiff may rebut the Defendant's nondiscriminatory reason for the adverse action by showing one of the following: (1) the stated reasons had no basis in fact; (2) the stated reasons were not the actual reasons; or (3) the stated reasons were insufficient to explain the defendant's action. *Imwalle*, 515 F.3d at 545 (citing *Manzer v. Diamond Shamrock Chemicals Co*., 29 F.3d 1078, 1084 (6th Cir. 1994)); *Wheeler v. McKinley Enters*., 937 F.2d 1158, 1162 n.4 (6th Cir. 1991). Ultimately, "[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). The Defendant is not entitled to summary judgment if the Plaintiff "has produced evidence from which a jury could reasonably doubt the employer's explanation." *Id*.; *see also Blair v. Henry Filters, Inc*., 505 F.3d 517, 533 (6th Cir. 2007) (holding that evidence produced in support of

plaintiff's prima facie case "may, but will not necessarily, suffice to show a genuine issue of material fact concerning pretext and thus to survive summary judgment."). The Plaintiff argues that the Defendant's explanation is pretextual under all three modes of proof.

### 1. Basis in Fact

The Plaintiff argues that the Defendant's proffered reason has no basis in fact because the medical program was financially viable. "The burden of production is on the plaintiff to demonstrate that the reason given by the employer is 'mistaken, foolish, trivial, or baseless.'" *Clay v. UPS*, 501 F.3d 695, 715 (6th Cir. 2007) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998)). If the plaintiff carries this burden, then the Defendant may rebut that evidence by showing it had an "honest belief" in its stated non-discriminatory reason. *Id*. In this circuit, the "honest belief" doctrine is as follows: "[F]or an employer to avoid a finding that its claimed nondiscriminatory reason was pretextual, 'the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made.'" *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir. 2006) (quoting *Smith*, 155 F.3d at 806). In this analysis, the "'key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action.'" *Id*. (quoting *Smith*, 155 F.3d at 807).

The Parties devote much briefing to whether the evidence supports the Defendant's claim that it had an honest belief in the financial unsustainability of the program the Plaintiff oversaw, but the Court does not need to reach that question. The honest belief doctrine only applies when a plaintiff has shown that the employer's "proffered reason appears 'mistaken, trivial, or baseless,'" *Clay*, 501 F.3d at 715, something the Plaintiff has not done. The Plaintiff offers two

types of evidence to show that the Defendant's proffered reason was "mistaken, trivial, or baseless": (1) that the Defendant's overall financial health was strong; and (2) that the financial expenditure summary the Defendant submitted fails to include revenue Bartunek admitted the adult education programs received from the state.

First, the Plaintiff points to a treasurer report of February 29, 2008 that shows a fund balance for the adult education program of $1,091,518.58. Bartunek testified in his deposition, however, that the adult education programs were expected to be self-supporting so that they did not have to draw any money out of the fund. The evidence of the size of the fund, therefore, is not relevant to the financial viability of the program.

Second, the omission of the state's contributions to the program is not enough to meet the Plaintiff's burden in light of the testimonies of Bartunek, Poling, and Board member Neil Huck. Each of these people testified that they considered the total financial picture, including the revenue from the state, in determining whether the program could sustain itself. The omission in the financial summary raises some questions about the degree of the program's financial distress but does not contradict the Defendant's evidence. The Plaintiff has not produced nor pointed to any evidence that would show that the Defendant's conclusion that the program was financially unsustainable was "mistaken, trivial, or baseless," and the Court cannot deny summary judgment on this basis.

### 2. Actual Reasons

The Plaintiff argues that finances did not actually motivate the non-renewal of the Plaintiff's contract. The Plaintiff points out that the Defendant's stated rationale for the Plaintiff's termination has shifted over time in the following manner: (1) Poling told the Plaintiff

on March 4, 2008 that her work performance was not a factor in his decision to recommend non-renewal; (2) Defendant asserted in support of its first motion for summary judgment that the Plaintiff's termination was based on poor work performance; and (3) the Defendant's current motion for summary judgment does not allege that work performance was at issue. In addition to showing how the alleged reason for the Plaintiff's termination has shifted over time, the Plaintiff has pointed to the discrepancies between the deposition testimonies of Poling and Bartunek. While Bartunek cited the Plaintiff's poor work performance as a factor in her termination, Poling stated that her performance, including her performance on growing the medical program, was satisfactory. These shifts and inconsistencies, the Plaintiff argues, support the conclusion that the Defendant's stated non-discriminatory reason is mere pretext. *See Asmo v. Keane, Inc.,* 471 F.3d 588, 596 (6th Cir. 2006) (concluding that inconsistency between what employer told plaintiff and what it asserted in lawsuits as its reasons for terminating plaintiff's employment was evidence of pretext). At the least, the shifts raise a genuine issue of material fact that preclude summary judgment. *See Cicero v. Borg-Warner Auto., Inc.,* 280 F.3d 579, 592 (6th Cir. 2002); *Eades v. Brookdale Senior Living, Inc.*, No. 08-6549, 2010 U.S. App. LEXIS 19755 (6th Cir. Sept. 22, 2010).

The Defendant argues in response that the Plaintiff has mischaracterized its first motion for summary judgment and Bartunek's statements; there has, therefore, been no shift in its rationale for the Plaintiff's termination. In the Defendant's first motion for summary judgment,[1] it wrote the following:

> Plaintiff Bennett's long-term involvement in and familiarity with the Career
> Center's medical programs and operations suggested that she could help the

---

[1] The Defendant filed this motion on October 26, 2009 arguing for the dismissal of Count I (Doc. 22). After the Plaintiff agreed to dismiss Count I, the Court entered an order in which it found the Defendant's motion moot (Doc. 51).

>Board of Education meet this goal. However, it became clear after execution of the administrative contract that Plaintiff's excellence as an instructor was not matched by a similar level of administrative skill and performance. It was apparent by late February 2008 that the programs for which Plaintiff Bennett served as administrator would not generate the funds necessary to support themselves, including paying Plaintiff Bennett's salary.

The support for these statements comes from an affidavit of Bartunek in which he said that "it became clear early on that Plaintiff Bennett lacked strength in the skills needed to function as a good administrator for a new set of programs." The sentence immediately following that one, as in the motion, referenced the fact that the Plaintiff's programs "would not generate the funds necessary to support themselves." In context, the comment upon the program's failures describes the comment upon the Plaintiff's performance. Neither source contains a critique of the Plaintiff's performance independent of the program's financial difficulties, and neither, therefore, contradicts the rationale offered by Bartunek and Poling that the Plaintiff's termination was based on the fact that the programs she supervised failed to make money. The Court's "common sense" tells it that the Defendant's position has been consistent throughout these proceedings as well as during the events leading up to this case. *See Chen*, 580 F.3d at 400. The Plaintiff's argument in this regard is not sufficient to show "not only that the defendant's proffered reason was a pretext, but that the real reason for the employer's action was intentional retaliation," *Imwalle*, 515 F.3d at 544, and the Court cannot deny summary judgment on this ground.

### 3. *Insufficient Explanation*

The Plaintiff argues that the Defendant's proffered reason is insufficient to explain the non-renewal of her contract. The Plaintiff first contends that the Defendant has not provided evidence supporting its assertion that the medical programs could not support Plaintiff's benefits

and salary or that her termination saved the program money. Second, the Plaintiff contends that

the fact that the WCCC also failed to re-hire her as an instructor despite her exemplary record in

that role – the record that earned her the position of Medical Programs Director – shows that the

Board had reasons for terminating her that were unrelated to the financial soundness of the

medical program. Third, the Plaintiff argues that the fact that Lenora Binegar took over Bennett's

role disproves the Defendant's assertion that it eliminated Bennett's position.

The Plaintiff's first argument effectively shifts the burden from the Plaintiff onto the

Defendant. The Plaintiff argues that the Defendant failed to prove that firing the Plaintiff saved

the Defendant money. This is not their burden. Rather, it is the Plaintiff's burden to prove that

the Defendant's financial justification is but pretext for its true discriminatory intent. *See*

*Imwalle*, 515 F.3d at 544.

The Plaintiff's second and third arguments are more persuasive. As described in Part

II.A.6 above, Binegar's responsibilities at the WCCC expanded after Bennett's termination. She

also possessed multiple job titles simultaneously, at least some of which suggest that her

supervisory obligations extended to more than just the Medical Assistant program as she testified

(e.g. "Medical Programs Coordinator"). Moreover, if the Defendant's contention that the non-

renewal of the Plaintiff's contract entirely eliminated a level of organizational hierarchy between

medical program instructors and coordinators and the director of adult education were true, then

Binegar's responsibilities and pay would be comparable if not equivalent to those of the other

program coordinators. The evidence shows, however, that Binegar receives a higher hourly rate

than Lori Sayre, the Program Coordinator for the Surgical Technologist program, and that

Binegar possesses greater responsibilities than Sayre, such as participating in the accreditation

process. Sayre also testified that Binegar had the authority to assign Sayre additional job duties, suggesting that Binegar existed in the same intermediate place within the hierarchy from which Bennett was ousted. Furthermore, the evidence conflicts as to whether the Defendant hired a part-time replacement for the Plaintiff, as Bartunek states in one affidavit, and whether the Plaintiff's duties were merely reassigned other employees, as the Defendant argues in its supplemental brief. Finally, Bartunek's testimony that the Board decided that only a part-time "Medical Advisor" was needed raises the question why the Board did not hire Bennett for that role, just as the Defendant's failure to re-hire the Plaintiff as an instructor casts doubt upon its contention that its only reason for firing the Plaintiff as the Medical Programs Director was money.

These inconsistencies together demonstrate that there are facts in the record from which a reasonable juror could conclude that the Defendant decided not to renew the Plaintiff's contract for purely financial reasons, and there are facts from which a reasonable juror could conclude that the financial justification is merely a pretext for the Defendant's retaliation against the Plaintiff for her advocacy on Johnson's behalf. Because there remains a genuine issue of material fact – whether the Defendant's non-discriminatory reason for its adverse action is pretextual –the Defendant's motion for summary judgment must be denied.

## V. CONCLUSION

The Defendant has failed to show that, as a matter of law, the Plaintiff did not engage in a protected activity or that she could not establish a prima facie case of causation between the alleged retaliation and the protected activity. Although the Defendant offered a legitimate, non-discriminatory reason for the Plaintiff's termination, the Plaintiff has shown that genuine

disputes of material fact remain as to whether the Defendant's non-discriminatory rationale is pretextual. The Court accordingly **DENIES** the Defendant's Motion (Doc. 62).


      **IT IS SO ORDERED.**


                                       **s/Algenon L. Marbley**
                                       **ALGENON L. MARBLEY**
                                       **United States District Court Judge**

**DATE: May 20, 2011**